UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

ANTHONY MORENE, 93-A-2151,

                          Plaintiff,           No. 03-CV-6485 CJS

     -vs-

                                             DECISION AND ORDER

JOHN ALVES, LESTER WRIGHT,
NURSE PRACTITIONER NORTHROP,
and DR. PATHAK,

                          Defendants.

_____

APPEARANCES

For plaintiff:            Anthony Morene, Pro se
                       93-A-2151
                       Auburn Correctional Facility
                       P.O. Box 618
                       Auburn, New York 13024

For defendants:         Kelly Ann McCarthy, Esq.
                       Office of the New York State
                       Attorney General
                       144 Exchange Boulevard
                       Rochester, NY 14614

INTRODUCTION

This is an action pursuant to 42 U.S.C. § 1983 in which the plaintiff, Anthony

Morene ("plaintiff"), a prison inmate who was formerly confined at Southport Correctional

Facility ("Southport"), alleges that defendants were deliberately indifferent to his serious

medical needs, in violation of the Eighth Amendment to the United States Constitution.

Now before the Court is defendants' motion for summary judgment [#31].  For the

reasons that follow, the application is denied.

1

BACKGROUND

The facts underlying plaintiff's medical condition are well known to the Court and the parties, and were set forth in a prior Decision and Order of the Court, *Morene v. Magee*, No. 01-CV-6455 CJS, 2004 WL 951343 (W.D.N.Y. Apr. 5, 2004). It is sufficient here to note the following facts. In 1987, prior to being confined at Southport, plaintiff sustained a gunshot wound to the head, which left metal bullet fragments lodged in his head near his right ear. Subsequently, at all relevant times herein, plaintiff was confined at Southport, where defendant John Alves, M.D. ("Alves") was the facility physician and defendant Jill Northrop N.P. ("Northrop") was a Nurse Practitioner. Defendant Lester Wright, M.D. ("Wright") was the Director of Health Services for the New York State Department of Correctional Services ("DOCS"), and defendant Kamal D. Pathak, M.D. ("Pathak") was a private Otolaryngologist.

In or about December 2002, plaintiff complained to Alves regarding pain in his ear and head in the vicinity of the gunshot wound. Alves sent plaintiff to be examined by Pathak on December 3, 2002. Pathak found no obvious reason for plaintiff's pain, and recommended that a CT scan be performed. The following day, Alves ordered a CT scan. John Chotkowski, M.D. ("Chotkowski"), reviewed the CT scan of plaintiff's head on January 16, 2003. Chotkowski's report states, in relevant part:

> CT of the head. Indication: status post gunshot wound . . . .
>
> Findings: A few small metal fragments are noted, a few immediately posterior to the external auditory meatus[1] and few which lie in the temporal bone. No bone disruption is evident. The mastoid air cells in the mastoid

---

[1]The"external auditory meatus" is "the passage leading from the opening of the external ear to the eardrum." MERRIAM WEBSTER'S MEDICAL DESK DICTIONARY, p. 230 (1993).

process on the right are opacified were [sic] where those on the left are aerated.  The exam is otherwise normal. . . .

Summary[:] small bone fragments in and adjacent to the right temporal bone which are of doubtful clinical significance.  Opacification of some of the air cells of the mastoid process[2] on the right which could be developmental or related to prior mastoid infection.  Acute infection cannot be excluded with complete certainty.  Study is otherwise normal.

Alves read Chotkowski's report on January 20, 2003, and directed that plaintiff receive "F/U [follow up] at routine clinic visit ENT clinic."  Alves sent plaintiff to Pathak again on March 4, 2003.  At that time, Pathak found no abnormalities in plaintiff's ear canal.  Pathak indicated that he planned to remove the metal fragments, but wanted to review the CT scan first.  On the day following Pathak's exam, March 5, 2003, Alves wrote an order, pursuant to Pathak's recommendation, for surgery to remove the metal fragments.  However, after Pathak reviewed the CT scan on April 1, 2003, he advised Alves: "Reviewed CT scan.  Pt. has tiny fragments of metal lodged on various part [sic] of the temporal bone.  These do not require removal."  Due to Pathak's opinion that surgery was unwarranted, Alves cancelled his surgery request on April 2, 2003.  Since then, plaintiff has repeatedly requested to have the surgery performed, and Alves has maintained that the surgery is not necessary.

Plaintiff has made numerous complaints of pain in his right ear.  Between January 16, 2003, the date of the CT scan, and April 8, 2003, the date plaintiff was told that his surgery had been cancelled, plaintiff requested over-the-counter ("otc") pain medication seven times, although it is not clear that all of those times involved ear pain.  According

---

[2] The "mastoid process" is "the process [projecting aspect] of the temporal bone behind the ear that is well developed and of somewhat conical form in adults," containing "mastoid cells," which are small, air-filled cavities. MERRIAM-WEBSTER'S MEDICAL DESK DICTIONARY 412-13 (1993).

to Alves, during that period, plaintiff never complained that the otc pain medications weren't working.  Immediately after being informed that his surgery had been cancelled, plaintiff began to complain on an almost daily basis that the otc pain medications were not relieving his ear pain.  As a result, Alves prescribed a stronger pain medication, Percogesic, on April 16, 2003.  On April 27, 2003, plaintiff complained that the Percogesic "was not working."  However, medical staff reported that plaintiff appeared to be in no acute distress.  During the following two months, plaintiff did not complain about ear pain or the pain medication.  Northrop examined plaintiff on June 22, 2003, at which time plaintiff complained of ear pain.  At plaintiff's request, Northrop asked Alves if plaintiff should be seen again by an Otolaryngologist, however Alves denied the request, because he saw no change in plaintiff's condition.  Plaintiff subsequently made no complaints regarding ear pain or the pain medications for approximately two months.  In September 2003, plaintiff was housed temporarily at Attica Correctional Facility, where medical staff prescribed him Percogesic.  When plaintiff returned to Southport after a week at Attica, he was not continued on Percogesic.   Plaintiff did not complain about pain or his medications from mid-September until early November 2003.  Plaintiff complained to Alves about pain on November 3, 2003, and Alves directed that plaintiff receive Advil and Percogesic.  In November and December 2003, plaintiff complained about pain in his ear "approximately every other day," and stated that the medications were not working.  Nonetheless, Alves continued plaintiff on Percogesic through mid-December 2003.  Northrop gave plaintiff Motrin in addition to the Percogesic on December 15, 2003, and Alves subsequently prescribed both Percogesic and Motrin for plaintiff as needed for pain.  Between December 20, 2003 and March 6, 2004, plaintiff

4

made no additional complaints of pain nor did he request additional medication.  On

March 6 and March 11, 2004, plaintiff again complained of ear pain, and Northrop

ordered that plaintiff be placed on Naprosyn.  Plaintiff complained that the Naprosyn was

not helping, but Alves directed that it be continued.  On March 29, 2004, Northrop

discontinued the Naprosyn and ordered that plaintiff be given Ultram, which, according

to Alves, is designed for "management of moderate to moderately severe chronic pain."

After a few days, plaintiff complained that the Ultram was not working, but Alves directed

that it be continued.  On April 3, 2004, plaintiff began complaining of pain in his ear when

chewing, and he again requested increased pain medication and surgery to remove the

metal fragments.  Northrop again requested that plaintiff be seen by an Otolaryngologist,

and plaintiff was also given a dental referral on April 22, 2004.  Pathak examined plaintiff

again on May 4, 2003, after which he opined that the metal fragments probably could not

be located and removed.  In addition to his complaints of pain, plaintiff also complained

that, on two occasions, December 4 and December 6, 2003, he had trouble sleeping

because of pain.

In addition to complaining to Alves and Northrop, plaintiff wrote letters to Wright.

Specifically, plaintiff alleges that on five occasions[3], he wrote letters to Wright,

complaining that the pain medications weren't helping, and requesting that surgery be

scheduled.

Plaintiff commenced this action against Wright, Alves, and Northrop, on October

3, 2003.  Plaintiff alleged that defendants violated his Eighth Amendment rights in

_____

[3]Plaintiff states that he wrote to Wright on April 21, 2003, April 22, 2003, April 23, 2003, April 24, 2003, and July 2, 2003.

essentially two ways: 1) by failing to provide surgery to remove bullet fragments from his "external auditory meatus, not [his] temporal bone"; and 2) by failing to provide "any kind of further treatment" to relieve his pain, which he believed to be caused by the metal fragments.  Plaintiff alleged that the constitutional violation began in April 2003 and has continued.

On May 21, 2004, plaintiff filed a motion [#29] to amend his complaint to add Pathak as a defendant.

Prior to receiving a ruling on the motion to amend, Wright, Alves, and Northrop filed the subject summary judgment motion [#31] on June 29, 2004.  In support of the motion, defendants submitted affidavits from Alves and Northrop, which detail the treatment they provided to plaintiff.  In this regard, defendants claim that the medical care that plaintiff received was proper, and that they are entitled to summary judgment for the following reasons: 1) there are "approximately two" metal fragments lodged in plaintiff's skull; 2) there are no metal fragments in plaintiff's external auditory meatus; 3) "metal embedded in bone does not move or change position over time"; 4) it is "doubtful" that the metal fragments are causing plaintiff's pain; 5) the fragments are "probably too small to locate and remove"; 6) defendants have not ignored plaintiff's claims of pain, but instead, have "engaged in an ongoing effort to find medications to relieve the pain"; 7) pain management "takes trial and error because patients respond differently [and] is experienced differently by different patients [so that] what works for one may not work for another."  Defendants further state that, even though they attempted to alleviate plaintiff's pain, they doubt the veracity of his complaints of pain, and suspect that his concern with the metal fragments may be the result of mental illness.  In that regard

6

defendants submitted copies of letters that plaintiff wrote in 2003 to both New York State Governor George Pataki, and to the Department of Correctional Services Inspector General, complaining that Southport's superintendent, Michael McGinnis ("McGinnis"), had implanted a "painful metal tracking device" in his ear, and that McGinnis was preventing Southport's medical staff from removing the device.

Although Wright was not directly involved in plaintiff's medical care, and was sued because of his position as Director of Health Services for DOCS, and because plaintiff wrote letters to him, he did not move for summary judgment on the grounds of lack of personal involvement.

In response to defendants' motion, plaintiff argues that the treatment defendants provided was not "adequate," because it did not alleviate his pain, and that there is, therefore, an issue of fact as to whether or not they chose an easier but less efficacious treatment.  In this regard, plaintiff cites *Williams v. Vincent*, 508 F.2d 541, 544 (2d Cir.1974) and *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir.1989).  Plaintiff also disputes defendants' assertion that the metal fragments are located only in his skull, and contends that he also has metal fragments in his external auditory meatus that could be causing his pain. Plaintiff further notes that Chotkowski's radiology report did not rule out an acute infection in the mastoid process, which is located directly behind the ear.

By Decision and Order [#41] filed on March 16, 2005, the Honorable Jonathan W. Feldman, United States Magistrate Judge, granted plaintiff's application to amend the complaint to add Pathak as a defendant.  Defendants have not subsequently amended their summary judgment motion in response to Magistrate Judge Feldman's ruling.

ANALYSIS

The standard for granting summary judgment is well established.  Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157 (1970).  "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e);  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986).  To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249; *see also*, FED. R. CIV. P. 56(e)("When a motion for summary judgment is made and supported as provided in this rule, and adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response,

8

by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993). The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED. R. CIV. P. 56(e). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

A court should read a *pro se* litigant's papers liberally, interpreting them "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994). This is particularly true when dealing with civil rights complaints. *Weinstein v. Albright*, 261 F.3d 127, 132 (2d Cir. 2001).

The standard to be applied in a case involving an alleged Eighth Amendment violation arising from denial of medical care is well settled:

> In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to his serious medical needs. This standard incorporates both objective and subjective elements. The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind.
>
> Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation. [T]he Supreme Court [has] explained that the Eighth Amendment's prohibition on cruel and unusual punishments encompasses the deliberate failure to treat a prisoner's *serious* illness or injury resulting in the infliction of unnecessary pain and suffering. Because society does not expect that

9

prisoners will have unqualified access to health care, a prisoner must first make this threshold showing of serious illness or injury in order to state an Eighth Amendment claim for denial of medical care.  Similarly, a prisoner must demonstrate more than an inadvertent failure to provide adequate medical care by prison officials to successfully establish Eighth Amendment liability.  An official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety, a state of mind equivalent to the familiar standard of 'recklessness' as used in criminal law.

*Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003)(citations and internal quotations omitted).  Courts have repeatedly held that disagreements over treatment do not rise to the level of a Constitutional violation. *See, Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998)("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim.").  Similarly, negligence constituting medical malpractice, without more, will not establish a constitutional claim. *Id.* (citation omitted).

An Eighth Amendment deliberate indifference claim is not limited to a situation where a doctor allegedly withheld treatment altogether.  Rather,

[i]n certain instances, a physician may be deliberately indifferent if he or she consciously chooses "an easier and less efficacious" treatment plan. *Williams v. Vincent*, 508 F.2d 541, 544 (2d Cir.1974); *see also Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir.1989) (reaffirming position that "choice of an easier but less efficacious course of treatment can constitute deliberate indifference"). In *Williams*, for example, the plaintiff alleged that the prison doctors chose simply to close a wound caused by the severing of his ear rather than attempting to reattach the organ. [The Second Circuit] held that this form of treatment could constitute deliberate indifference rather than a mere difference of opinion over a matter of medical judgment.

*Chance v. Armstrong*, 143 F.3d at 703.

Applying the foregoing legal principles to the facts of this case, the Court finds that defendants' summary judgment motion must be denied.  The Court reads defendants' motion as seeking judgment on a claim that they should have performed

surgery to remove metal fragments from his skull.  The problem with this, however, is that plaintiff is not claiming that the metal fragments embedded in bone are the source of his pain, but instead, claims that the pain is due to fragments in the external auditory meatus. *See*, Complaint, addendum p. 3 (Wherein he claims that he wants surgery "to remove the metal fragments from my external auditory meatus *not my temporal bone*.") (emphasis added).

Viewing plaintiff's claim as involving his external auditory meatus, there are triable issues of fact.  For example, as discussed earlier, defendants contend that there are only two metal fragments total, and that the fragments are embedded in plaintiff's skull. Moreover, defendants contend that metal fragments embedded in bone generally do not move over time, and that the fragments in plaintiff's skull are therefore unlikely to be the source of his pain. *See*, Def. Memo of Law [#34], pp. 1, 7, 8; Alves Decl. [#20] ¶ ¶ 4, 33[4]-34, 39.  However, Chotkowski opined that there are "*a few [fragments] immediately posterior to the external auditory meatus* and a few which lie in the temporal bone." (Emphasis added).  Thus, not only does Chotkowski's statement appear to conflict with Pathak's opinion regarding the number of metal fragments at issue, it also seems to state that not all of the fragments are embedded in bone.  Defendants have not addressed these apparent inconsistencies.

Moreover, plaintiff further contends, based again on Chotkowski's report, that his pain may have been caused by an acute infection of the mastoid process, which is

---

[4]At paragraph 33 of Dr. Alves's declaration, he cites Pathak's "report of his first consultation on 4/1/03" as proof that the metal fragments are only in plaintiff's skull, and not the external auditory meatus. However, as noted above, at the time of his consultation on April 1, 2003, Pathak had not yet seen plaintiff's CT scan.  Although defendants contend that Pathak's notes establish that there are no metal fragments in the external auditory meatus, Pathak never actually stated as much.

located directly behind plaintiff's ear.  Although this theory was not clearly spelled out in

the complaint, the Court must read the complaint liberally to raise the strongest

arguments it suggests.  In this regard, attached to the complaint is Chotkowski's report,

which clearly states that an acute infection of the mastoid process could not be ruled out

by the CT scan.  Plaintiff also referred to the possibility of such an infection in his

response to the summary judgment motion.  Although Alves received Chotkowski's

report, there is nothing in the present record showing that defendants did anything to

either rule out or address such an infection, which, if it existed, may well have been the

source of plaintiff's pain.[5]  Defendants' motion papers do not even address the possibility

of an infection in the mastoid process.

      With the issues thus framed, it is possible that defendants may yet be able to

demonstrate their entitlement to summary judgment.  However, on the present record

they have not done so.

CONCLUSION

      For all of the foregoing reasons, defendants' summary judgment motion [#31] is

DENIED.

      So Ordered.

Dated: Rochester, New York
     May 31, 2005                  ENTER:


                              /s/ Charles J. Siragusa
                              CHARLES J. SIRAGUSA
                              United States District Judge

---

[5]Plaintiff may believe that any such infection would be related to the metal fragments. Chotkowski's report does not appear to connect the possible infection with the presence of the metal fragments, however, the Court does not believe that such a connection is necessary to plaintiff's claim.

12